IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LARRY WASHINGTON #407-448,

     Plaintiff,

  v.

GARY D. MAYNARD, et al.,

     Defendants.

CIVIL ACTION NO. GLR-13-03767

## PLAINTIFF'S SECOND AMENDED COMPLAINT

1.     Plaintiff Larry D. Washington ("Mr. Washington"), by his attorneys, files this Second Amended Complaint against Defendants Gary D. Maynard, Marion Tuthill, Shavella Miles, Karen Moore, Anika Beverly, Michael Porter, and Andrene Ffowlkes (collectively, the "Defendants") in their individual capacities, for damages arising out of Defendants' violation of Mr. Washington's rights under the United States Constitution and Maryland common law, and alleges as follows:

## I.
## NATURE OF ACTION

2.     This is a civil action under 42 U.S.C § 1983 seeking damages against Defendants for committing acts, under color of state law, with the intent and for the purpose of depriving Plaintiff of rights, privileges, and immunities secured under the Constitution and laws of the United States.

3.     This action arises from a life-threatening, disfiguring attack Mr. Washington, then a fifty-two-year-old man, endured on May 31, 2012, while incarcerated at Baltimore City Detention Center ("B.C.D.C." or the "detention center") and purportedly under the protection of Defendants, at the hands of fellow inmate Brandon Dovi ("Inmate Dovi") and other members of the Black Guerilla Family

(the "BGF"), a prison gang that, upon information and belief, maintained an extensive criminal network within the walls of B.C.D.C. with the cooperation and complicity of many Maryland Department of Public Safety and Correctional Services employees.

4.      Because Mr. Washington, who worked in sanitation and maintenance at B.C.D.C., refused to transport contraband for Inmate Dovi and the BGF, they attacked him in his cell in February or early March 2012. After the first attack, Mr. Washington was relocated to another housing unit for his protection, and Inmate Dovi—whom Defendant Moore positively identified as Mr. Washington's primary assailant—was placed in punitive segregation.

5.      When his segregation sentence ended, however, Inmate Dovi was housed with Mr. Washington on B-section. Mr. Washington immediately reported to Defendants Ffowlkes and Beverley that he feared for his health and safety, since he was now living in the same housing unit as his attacker. Mr. Washington made these concerns known both orally and in writing. He wrote multiple letters—none of which was answered—to Defendants Tuthill, Miles, Moore, Beverly, and Porter requesting transfer to another housing unit. Meanwhile, Inmate Dovi began threatening Mr. Washington. With increasing alarm, Mr. Washington continued to complain to his housing unit officer on a daily basis. Yet despite his pleas, Mr. Washington and Inmate Dovi remained housed together on B-section, in worrying proximity to one another.

6.      On the morning of May 31, 2012, as any of the Defendants could have predicted given their knowledge of the situation, Inmate Dovi and several other members of the BGF gained entry to Mr. Washington's cell and viciously attacked him again. Mr. Washington lost his left eye in this attack and continues to suffer emotional, psychological, and physical injuries as a direct result of Defendants' deliberate indifference to his plight.

7.      Inmate Dovi's second attack on Mr. Washington was the direct result of Defendants

knowingly disregarding the excessive risk to Mr. Washington's health and safety presented by Mr. Dovi's presence in his housing unit, even after Mr. Washington made multiple requests to be relocated, all of which fell on deaf ears. Had any one of the Defendants acknowledged Mr. Washington's requests and taken minimal steps to move either him or Inmate Dovi to another housing unit, Mr. Washington would not have suffered the brutal attack in which he lost his left eye, and because of which he now experiences chronic pain, crippling panic attacks, failing sight in his intact right eye, and other medical complications.

8.     On December 13, 2013, Mr. Washington filed with this Court a Complaint and Motion to Proceed *In Forma Pauperis*, which was provisionally granted on January 6, 2014. (See ECF Nos. 1, 2, and 3).

9.     On April 3, 2014, this Court denied Defendants' Motion to Dismiss, which was filed on March 6, 2014, and granted Mr. Washington's Motion for Counsel. (See ECF Nos. 6, 6-1, 8, and 10). This Court appointed Mr. Washington's present counsel on April 4, 2014, and ordered that an Amended Complaint be filed (see ECF Nos. 10 and 11).

10.     On July 3, 2014, Mr. Washington, by his counsel, filed a First Amended Original Complaint. (See ECF No. 14), which included four (4) additional defendants who were not parties to Mr. Washington's December 13, 2013 Complaint. The full names and identities of these additional defendants remained unknown to Mr. Washington at the time the First Amended Complaint was filed.

11.     Defendants filed a second Motion to Dismiss on July 15, 2014. (See ECF Nos. 16, 16-1). Since then, counsel for Defendants have engaged in an investigation into (a) the identities of the additional defendants whom Mr. Washington included in the First Amended Complaint; and (b) whether these additional defendants would seek and be provided representation through the Maryland Office of the Attorney General. To facilitate this investigation, Mr. Washington filed a total of six (6) consent

motions requesting an extension of time in which to respond to Defendants' Motion to Dismiss (see, e.g., ECF No. 32).

12.     Defendants have in large part completed this investigation, and the identities of three (3) of the additional defendants are now known.

## II.
## PARTIES

13.     Plaintiff Larry D. Washington is a prisoner currently incarcerated at Roxbury Correctional Institution ("R.C.I."), which is located at 18701 Roxbury Road, Hagerstown, Maryland 21746. Mr. Washington, a citizen of the United States, is fifty-three years old and has been in the custody of R.C.I. since September 2013.

14.     Defendant Gary D. Maynard is former Maryland Secretary of Public Safety and Correctional Services. He occupied this position at all times relevant to this Second Amended Complaint, from 2007 until December 10, 2013, when he stepped down in the wake of the scandal caused by public awareness of the BGF's unimpeded criminal activities at B.C.D.C. Defendant Maynard, his subordinates, and other similarly situated state employees were responsible for the operation and implementation of policies pertinent to the Maryland Department of Public Safety and Correctional Services and B.C.D.C.

15.     Defendant Marion Tuthill, an employee of the Maryland Department of Public Safety and Correctional Services, has served as Warden of B.C.D.C. since February 2011. Defendant Tuthill held this position while Mr. Washington was incarcerated at B.C.D.C. and during both attacks Mr. Washington suffered at the bidding of the Black Guerilla Family. Defendant Tuthill, his subordinates, and other similarly situated state employees were responsible for the operation and implementation of policies pertinent to the Maryland Department of Public Safety and Correctional Services and B.C.D.C.

16.     Defendant Shavella Miles, a former employee of the Maryland Department of Public

Safety and Correctional Services, served as Chief of Security at B.C.D.C. at all times relevant to this Second Amended Complaint. Upon information and belief, Defendant Miles was removed from this position in May 2013 and placed on administrative leave due in part to the scandal caused by the BGF's unimpeded criminal activities at B.C.D.C.

17.     Defendant Karen Moore, an employee of the Maryland Department of Public Safety and Correctional Services, served at all times relevant to this Second Amended Complaint as a correctional officer at B.C.D.C. Upon information and belief, Defendant Moore, a Captain, was the prison officer chiefly responsible for Mr. Washington's safety while he was incarcerated at the detention center.

18.     Upon information and belief, Defendant Anika Beverly was employed as a correctional sergeant at B.C.D.C. at all times relevant to this Second Amended Complaint.

19.     Upon information and belief, Defendant Michael Porter was employed as a correctional sergeant at B.C.D.C. at all times relevant to this Second Amended Complaint.

20.     Upon information and belief, Defendant Andrene Ffowlkes was employed as a correctional officer at B.C.D.C. at all times relevant to this Amended Complaint.

21.     At all times relevant to this Second Amended Complaint, all Defendants acted under color of state law.

### III.
### JURISDICTION AND VENUE

22.     This action arises under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Mr. Washington asserts this claim under the Eighth Amendment to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution, because Defendants deprived him of his right to be free from cruel and unusual punishment by failing to protect him from a serious attack at the hands of his fellow inmates that Defendants knew would very likely occur in the face of their deliberate indifference.

Mr. Washington also asserts this claim under the Fourteenth Amendment to the United States Constitution, because Defendants failed to protect him from the substantial risk of serious injury that they knew would befall him if they disregarded his pleas to be relocated away from his attacker.

23.     This Court has original jurisdiction over Plaintiff's claim under 28 U.S.C. § 1331, because this claim arises under the Constitution, laws, or treaties of the United States.

24.     This Court has supplemental jurisdiction over the Maryland state law claims Plaintiff asserts under 28 U.S.C. § 1367(a), because these claims are so related to Plaintiff's claim under 42 U.S.C. § 1983 that they form part of the same case or controversy.

25.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because most or all of the Defendants reside and may be found in the District of Maryland, and the acts or omissions giving rise to these claims occurred in the District of Maryland. Specifically, Mr. Washington was incarcerated as a pretrial detainee at B.C.D.C., a state-run penitentiary in Baltimore City, when he was twice attacked by members of the Black Guerilla Family while under the ostensible care and protection of Defendants.

## IV.
## FACTUAL BACKGROUND

26.     B.C.D.C. is a Maryland Department of Public Safety and Correctional Services facility located at 401 East Eager Street in Baltimore, Maryland. B.C.D.C. has been a state-run institution since the 1990s, although as a jail rather than a prison it would typically fall under the jurisdiction of Baltimore City. Upon information and belief, most of the inmates incarcerated at B.C.D.C. are awaiting trial and are held on bail. Despite this fact, inmates at B.C.D.C. remain in the detention center for periods as long as one to three years.

27.     Mr. Washington's incarceration at B.C.D.C. began in May 2011, when he was fifty-one years old.

28.     In the spring of 2012, after awaiting trial for almost one year, Mr. Washington was housed on F-section, in cell 81-82. Inmate Dovi, who was twenty-one years old at the time, slept next door to Mr. Washington, in F-section 79-80. Individual cells at B.C.D.C. are small—roughly six feet by ten feet, upon information and belief—and contact between inmates residing in the same cell block is frequent.

29.     Inmate Dovi was at the time a known member of the Black Guerilla Family. The BGF is a nationwide gang that operates in prisons and on the streets of major cities throughout the United States, including Baltimore. Although primarily a prison gang, according to an April 2013 indictment of former B.C.D.C. correctional officers and inmates, the BGF is increasingly involved in criminal activity beyond the walls of correctional facilities like B.C.D.C., including narcotics trafficking, robbery, assault, and murder.

30.     According to the April 2013 indictment, the BGF became the dominant gang within B.C.D.C. in 2006. Gang members detained at B.C.D.C. were thus able to establish and maintain control over a vast criminal network that involved the trafficking of illegal narcotics on the streets of Baltimore and the trafficking of illegal narcotics and other contraband—including tobacco, cell phones, and prescription painkillers like OxyContin and Percocet—within the walls of B.C.D.C. Numerous correctional officers and other B.C.D.C. employees willingly aided and abetted the BGF's criminal schemes, and general corruption and mismanagement within B.C.D.C. enabled the gang to operate unfettered.

31.     Members of the BGF who violated the gang's code of conduct or otherwise disobeyed orders from a superior, including Tayvon White, or "Tay," the BGF's leader within B.C.D.C., were routinely subject to disciplinary measures including physical attack, stabbing, and murder.

32.     BGF members bribed or otherwise enlisted correctional officers and other B.C.D.C.

7

employees to assist in smuggling and transporting contraband within the detention center and concealing the extent of their criminal enterprise from law enforcement. So widespread and unabashed were these activities that they were generally known to all B.C.D.C. employees, upon information and belief, even those who chose not to aid and abet the BGF.

33.     According to the April 2013 indictment, the BGF was known to exploit and control "working men" inside B.C.D.C.—inmates who, like Mr. Washington, had received work assignments as a result of their good behavior. "Working men" occupied paid positions and were selected by prison staff to move freely throughout the detention center.

### The Black Guerilla Family's First Attack on Mr. Washington

34.     Inmate Dovi and other members of the Black Guerilla Family first attacked Mr. Washington in February or early March of 2012.

35.     As a "working man," Mr. Washington occupied a position that allowed him access to locations throughout B.C.D.C. inaccessible to other prisoners.

36.     Inmate Dovi, who lived in the cell directly next to Mr. Washington, asked Mr. Washington to transport contraband for the BGF within the detention center by picking it up from certain correctional officers who worked for the BGF and depositing it with others, including Antonia Allison and Ebonee Braswell, both of whom are named in the April 2013 indictment.

37.     Inmate Dovi made it clear to Mr. Washington that "Tay"—Tayvon White, the BGF's *de facto* leader within B.C.D.C.—wanted him to act at the behest of the BGF. Mr. Washington did not feel comfortable working for the BGF, however, and when Inmate Dovi again requested that Mr. Washington pick up and deliver contraband on behalf of the BGF, Mr. Washington refused.

38.     The following day, Inmate Dovi persuaded a correctional officer to open the door to Mr. Washington's cell by claiming that it was his. Inmate Dovi and approximately four other known BGF

members entered Mr. Washington's cell and attacked him, in full view of the officers and other inmates in the housing unit. An officer called for assistance, and Defendant Moore, who was shift supervisor at the time, identified Inmate Dovi as Mr. Washington's principal assailant. Correctional officer Johnson wrote an infraction report attributing the attack to Inmate Dovi. Inmate Dovi was then placed in punitive segregation.

39.    Because neither he nor Defendant Moore could identify Mr. Washington's other assailants with accuracy, Mr. Washington was relocated to one of the two floors reserved for male prisoners in the Women's Detention Center (the "W.D.C.") facility within B.C.D.C. After he faced harassment and threats of retribution from members of the BGF in the W.D.C., however, Mr. Washington was relocated twice more until he ended up on B-section, seemingly out of harm's way.

### Mr. Washington Pleads to Be Relocated for His Own Health and Safety

40.    After Inmate Dovi's segregation sentence ended, however, he was inexplicably placed on B-section with Mr. Washington—despite the fact that he had served this sentence for attacking Mr. Washington.

41.    Mr. Washington saw Inmate Dovi on the phone at the end of the hall on which he lived one afternoon, and he immediately reported it to Defendant Ffowlkes, his tier officer, explaining that he feared he would be attacked again, or worse, if he was not relocated. Defendant Ffowlkes told Mr. Washington that she would contact her supervisor, Defendant Beverly, to report his problem, and yet nothing happened. Defendant Ffowlkes claimed that she could in fact do nothing to relocate Mr. Washington.

42.    Mr. Washington reported his situation to Defendant Moore—who had identified Inmate Dovi as the primary assailant in the first attack—but she also told him that she could do nothing for him.

43.    Several days passed, and Inmate Dovi began threatening Mr. Washington. Despite the

fact that Defendants Ffowlkes and Beverly knew that Mr. Washington was in grave danger, they told him that they could not relocate him to another housing unit.

44.    Mr. Washington wrote multiple letters to Defendants Tuthill, Miles, Moore, Beverly, and Porter, imploring them to take minimum steps to protect his health and safety. None of his requests were heeded, despite the fact that Defendants knew that Mr. Washington would very likely be attacked by the BGF again because the BGF habitually attacked inmates who refused to cooperate with their criminal schemes. Defendants remained deliberately and callously indifferent to the known risk that Inmate Dovi and the BGF posed to Mr. Washington.

## The Black Guerilla Family's Second Attack on Mr. Washington

45.    As Mr. Washington expected, Inmate Dovi approached him one day to ask whether he could pick up contraband from correctional officers Antonia Allison and Ebonee Braswell for the BGF and "Tay." Mr. Washington again refused. Inmate Dovi told Mr. Washington that he would "stab him that night" unless he cooperated. Fearing for his life, Mr. Washington continued to request aid from Defendants Tuthill, Miles, Moore, Beverly, and Porter.

46.    On May 31, 2012, two days after Inmate Dovi explicitly threatened Mr. Washington's life, Inmate Dovi and several other known members of the BGF told the duty officer during morning recreation that they had "left something inside Mr. Washington's cell." This transparent subterfuge easily gained them access, and she opened the door for them. As Mr. Washington was climbing down from the top bunk of his bed, his assailants pulled him to the ground, savagely beating and kicking him. One of them stabbed him in his left eye with a sharp object. Mr. Washington cried out for the duty officer, and another inmate yelled out that they were "going to kill him." The officers finally responded, and an emergency medical team was called to transport Mr. Washington to the Johns Hopkins Hospital.

47.    After the second attack, Mr. Washington's left eye was surgically removed by his doctors

at the Wilmer Eye Institute at Johns Hopkins when they determined that they could not save it.

48.     In addition to the loss of his left eye, Mr. Washington suffered broken ribs and other complications in the second attack. Mr. Washington must now take medication to manage the pain he suffers as a result of his attack, as well as Prozac to manage the anxiety and panic attacks he regularly endures as a result of this traumatic experience, which has left him weakened and vulnerable to further depredations at R.C.I. As a result of the psychological trauma Mr. Washington continues to suffer, he participates in a trauma support group at R.C.I.

## V.
## CAUSES OF ACTION

### Count I – 42 U.S.C. § 1983
### Violation of Plaintiff's Constitutional Rights To Be Free From Cruel and Unusual Punishment Under the Eighth Amendment
### (Against All Defendants)

49.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

50.     Defendants, either intentionally or with deliberate indifference and reckless disregard for Mr. Washington's health and safety, ignored his repeated requests following the first attack to be relocated to a housing unit in which he would not be in the presence of Inmate Dovi, a man who had threatened his life. Defendants knew of and disregarded the excessive risk to Mr. Washington's health and safety posed by Inmate Dovi.

51.     The acts of all Defendants constituted conduct under color of state law that deprived Plaintiff of rights, privileges, and immunities secured by the Constitution and Laws of the United States.

52.     Defendants had actual knowledge of the initial attack on Mr. Washington at the hands of Inmate Dovi and the Black Guerilla Family. Defendants likewise had actual knowledge of the BGF, its hegemony within B.C.D.C., and the danger it posed to inmates who chose not to cooperate with the criminal enterprise its members and associates ran within the detention center.

53.     After Inmate Dovi was released from punitive segregation, Defendants nevertheless placed him on B-section with Mr. Washington knowing full well that Inmate Dovi and other members of the BGF had recently attacked Mr. Washington, and knowing that Inmate Dovi had in fact been sent to punitive segregation because of this attack. Defendants disregarded the substantial risk this posed to Mr. Washington's health and safety.

54.     Defendants had actual knowledge that Inmate Dovi continued to reside on B-section with Mr. Washington despite Mr. Washington's repeated pleas to be relocated. Defendants knew the very real danger this posed to Mr. Washington. Defendants were aware of Inmate Dovi's membership in the BGF, and of the BGF's almost total dominion within the walls of B.C.D.C.

55.     In other words, Defendants were aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed for Mr. Washington, and Defendants drew this inference. Defendants chose not to protect Mr. Washington.

56.     At all times relevant to this Amended Complaint, Defendants owed Mr. Washington a duty to ensure his reasonable safety and keep him free from violence at the hands of his fellow inmates. Defendants were derelict in this duty.

57.     As a result of Defendants' failure to protect Mr. Washington from an attack that they had reasonable knowledge would in fact occur, Mr. Washington's left eye was damaged so severely that it had to be surgically removed. Mr. Washington, a fifty-three year old man, now suffers from chronic pain, as well as severe anxiety and panic attacks. He must take medication for all of these conditions and attend a support group for survivors of trauma, and he remains under medical supervision at Roxbury Correctional Institution. The loss of Mr. Washington's left eye has strained Mr. Washington's intact right eye, which makes it difficult for him to see. Mr. Washington's doctors at the Wilmer Eye Institute recommended that he receive a prosthetic eye, but he has so far been denied this medical care and must

wear sunglasses to disguise his empty left eye socket.

58.     Defendants, by their actions, have denied Mr. Washington the rights and protections provided by the Eighth Amendment of the United States Constitution, which entitles inmates to reasonable protection from attack by fellow inmates. In Mr. Washington's case, reasonable protection simply would have required any of the Defendants to heed his repeated requests to be relocated to a different housing unit.

59.     As a further and proximate result of Defendants' violations of the Eighth Amendment, Mr. Washington has suffered harm in the form of denied medical treatment, physical pain, shame, humiliation, degradation, and emotional stress. In light of Defendants' willful, knowing, and intentional violations of Mr. Washington's constitutional rights and their reckless and callous indifference to his health and safety, Mr. Washington seeks an award of compensatory damages in an amount to be determined at trial.

### Count II – 42 U.S.C. § 1983
### Violation of Plaintiff's Constitutional Rights Not To Be Deprived of Life, Liberty, or Property Under the Fourteenth Amendment to the United States Constitution
### (Against All Defendants)

60.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

61.     Defendants, either intentionally or with deliberate indifference and reckless disregard for Mr. Washington's health and safety, ignored his repeated requests following the first attack to be relocated to a housing unit in which he would not be in the presence of Inmate Dovi, a man who had threatened his life. Defendants knew of and disregarded the excessive risk to Mr. Washington's health and safety posed by Inmate Dovi.

62.     The acts of all Defendants constituted conduct under color of state law that deprived Plaintiff of rights, privileges, and immunities secured by the Constitution and Laws of the United States.

63.     Defendants had actual knowledge of the initial attack on Mr. Washington at the hands of

Inmate Dovi and the Black Guerilla Family. Defendants likewise had actual knowledge of the BGF, its hegemony within B.C.D.C., and the danger it posed to inmates who chose not to cooperate with the criminal enterprise its members and associates ran within the detention center.

64.     At all times relevant to this Amended Complaint, Defendants owed Mr. Washington a duty to keep him free from violence at the hands of his fellow inmates. Defendants were derelict in this duty. Defendants were aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed for Mr. Washington, and Defendants drew this inference. Defendants chose not to protect Mr. Washington.

65.     As a result of Defendants' failure to protect Mr. Washington from an attack that they had reasonable knowledge would in fact occur, Mr. Washington's left eye was damaged so severely that it had to be surgically removed. Mr. Washington, a fifty-three year old man, now suffers from chronic pain, as well as severe anxiety and panic attacks. He must take medication for all of these conditions and attend a support group for survivors of trauma, and he remains under medical supervision at Roxbury Correctional Institution. The loss of Mr. Washington's left eye has strained Mr. Washington's intact right eye, which makes it difficult for him to see. Mr. Washington's doctors at the Wilmer Eye Institute recommended that he receive a prosthetic eye, but he has so far been denied this medical care and must wear sunglasses to disguise his empty left eye socket.

66.     Defendants, by their actions, have denied Mr. Washington the rights and protections provided by the Fourteenth Amendment of the United States Constitution, which entitles inmates not to be deprived of life, liberty, or property without due process. In Mr. Washington's case, reasonable protection under the Fourteenth Amendment simply would have required any of the Defendants to heed his repeated requests to be relocated to a different housing unit.

67.     As a further and proximate result of Defendants' violations of the Fourteenth

Amendment, Mr. Washington has suffered harm in the form of denied medical treatment, physical pain, shame, humiliation, degradation, and emotional stress. In light of Defendants' willful, knowing, and intentional violations of Mr. Washington's constitutional rights and their reckless and callous indifference to his health and safety, Mr. Washington seeks an award of compensatory damages in an amount to be determined at trial.

**Count III – 42 U.S.C. § 1983 – Supervisory Liability**
***Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)**
**(Against Defendants Maynard, Tuthill, Miles, and Moore)**

68.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

69.   Defendants Maynard, Tuthill, Miles, and Moore were experienced correctional officers and supervisors who, along with their subordinates and other similarly situated State employees, were responsible for the operation and implementation of policies pertinent to the Maryland Department of Public Safety and Correctional Services and B.C.D.C.

70.   At all times relevant to this Amended Complaint, Defendants possessed actual or constructive knowledge that their subordinates at B.C.D.C. were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Mr. Washington—inmates who refused to participate in the criminal enterprise directed by the BGF and its members and associates at B.C.D.C., many of whom were themselves correctional officers. Defendants possessed actual or constructive knowledge of the BGF, its hegemony within B.C.D.C., and the danger it posed to inmates who chose not to cooperate with its rules and policies.

71.   Despite this knowledge, Defendants' response to Mr. Washington's pleas to be relocated away from a known member of the BGF who had previously attacked him, and of whose previous attack Defendants were aware, was so inadequate as to show deliberate indifference to or tacit authorization of this failure to protect Mr. Washington from an attack that they had reasonable knowledge would in fact

occur.

72.     Defendants' conduct was a causative factor in the constitutional injuries inflicted on Mr. Washington, an inmate committed to their care. Had any of the Defendants chosen to heed Mr. Washington's pleas to be relocated and taken action to relocate either him or Inmate Dovi out of B-section, Mr. Washington would not have suffered the constitutional injuries he experienced.

73.     In light of Defendants' willful, knowing, and intentional violations of Mr. Washington's constitutional rights and their reckless and callous indifference to his health and safety, Mr. Washington seeks an award of compensatory damages in an amount to be determined at trial.

### Count IV – Negligence
### (Against All Defendants)

74.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

75.     Defendants had a legal duty to use reasonable care to protect Mr. Washington's health and safety while he was incarcerated at B.C.D.C. and under their supposed protection.

76.     Defendants breached this duty by allowing Inmate Dovi, whom they knew to be a dangerous member of the BGF—a gang that in essence controlled the detention center at all times relevant to this Amended Complaint—to remain housed on B-section with Mr. Washington despite the fact that Inmate Dovi had already attacked Mr. Washington once, and indeed had completed a stint in punitive segregation for this attack. Defendants permitted Inmate Dovi to remain on Mr. Washington's housing unit in spite of Mr. Washington's multiple pleas to be relocated.

77.     As a direct and proximate result of Defendants' failure to use reasonable care to protect Mr. Washington's health and safety, Mr. Washington endured a horrific attack at the hands of Inmate Dovi and other members of the BGF in which he lost his left eye and suffered other emotional, psychological, and physical injuries, all of which will remain with him for the rest of his life.

78.     In light of Defendants' willful, knowing, and intentional violations of Mr. Washington's

constitutional rights and their reckless and callous indifference to his health and safety, Mr. Washington

seeks an award of compensatory damages in an amount to be determined at trial.

**Count V – Negligent Hiring, Supervision, and Retention**
**(Against Defendants Maynard, Tuthill, Miles, and Moore)**

79.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

80.     At all times relevant to this Amended Complaint, Defendants Maynard, Tuthill, Miles,

and Moore were employed by the Maryland Department of Public Safety and Correctional Services, and

worked at, or for, B.C.D.C., where they all occupied positions of authority that, upon information and

belief, involved the supervision of other B.C.D.C. employees, including all correctional officers.

81.     B.C.D.C. employees, including Defendants Beverly, Porter, and Ffowlkes, willfully

flouted their duty to keep Mr. Washington free from attack at the hands of his fellow inmates and

displayed gross incompetence by allowing Inmate Dovi, whom they knew to be a dangerous member of

the BGF—a gang that in essence controlled the detention center at all times relevant to this Second

Amended Complaint—to remain housed on B-section with Mr. Washington despite the fact that Inmate

Dovi had already attacked Mr. Washington once, and indeed had completed a stint in punitive

segregation for this attack. Defendants permitted Inmate Dovi to remain on Mr. Washington's housing

unit in spite of Mr. Washington's multiple pleas to them to be relocated.

82.     Defendants possessed actual or constructive knowledge of the incompetence of B.C.D.C.

employees, including Defendants Beverly, Porter, and Ffowlkes, and furthermore were aware of the

corruption and mismanagement that ran rife at B.C.D.C. at all times relevant to this Second Amended

Complaint—corruption and mismanagement that created a permissive atmosphere in which a prison gang

as dangerous as the BGF was able to thrive and consequently exploit inmates like Mr. Washington.

83.     As a direct and proximate result of Defendants' failure to use reasonable care to protect

Mr. Washington's health and safety, Mr. Washington endured a horrific attack at the hands of Inmate Dovi and other members of the BGF in which he lost his left eye and suffered other emotional, psychological, and physical injuries, all of which will remain with him for the rest of his life.

84.     Defendants' negligence in hiring, supervising, and retaining these employees was the proximate cause of Mr. Washington's injuries. Defendants knew or should have known that the BGF, a dangerous criminal syndicate, had infiltrated B.C.D.C. and was trafficking in narcotics and other contraband both within and without the detention center, with the willing connivance of many correctional officers under Defendants' direct control and supervision.

85.     In light of Defendants' willful, knowing, and intentional violations of Mr. Washington's constitutional rights and their reckless and callous indifference to his health and safety, Mr. Washington seeks an award of compensatory damages in an amount to be determined at trial.

### Count VI – Intentional Infliction of Emotional Distress
### (Against All Defendants)

86.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

87.     Defendants acted with extreme recklessness when they allowed Inmate Dovi, whom they knew to be a dangerous member of the BGF—a gang that in essence controlled the detention center at all times relevant to this Amended Complaint—to remain housed on B-section with Mr. Washington despite the fact that Inmate Dovi had already attacked Mr. Washington once, and indeed had completed a stint in punitive segregation for this attack. Defying all ordinary logic, Defendants permitted Inmate Dovi to remain on Mr. Washington's housing unit in spite of Mr. Washington's multiple pleas to be relocated.

88.     Allowing Inmate Dovi to remain housed in such close proximity to Mr. Washington while at the same time ignoring Mr. Washington's pleas to be relocated amounts to extreme and

outrageous conduct on the part of Defendants, who had actual knowledge of the initial attack on Mr. Washington at the hands of Inmate Dovi and the Black Guerilla Family and of the very real threat they posed to Mr. Washington.

89.     As a direct and proximate result of Defendants' reckless, extreme, and outrageous conduct, Mr. Washington endured a horrific attack at the hands of Inmate Dovi and other members of the BGF in which he lost his left eye and suffered other emotional, psychological, and physical injuries, all of which will remain with him for the rest of his life.

90.     Mr. Washington suffered, and continues to suffer, extreme emotional, psychological, and physical distress as a result of Defendants' conduct.

## VI.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff Larry D. Washington prays that the Court enter a judgment awarding the following:

a.     monetary damages for all harm suffered as a result of Defendants' conduct;

b.     such other and further relief to which he may show himself entitled in law or equity.

Dated: February 27, 2015                Respectfully submitted,

                                          / s /

_____
Brett Ingerman
Maryland Federal Bar Number 23037
Keelan F. Diana
Maryland Federal Bar Number 19100
DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, MD 21209-3600
Phone: (410) 580-3000
Fax: (410) 580-3001
brett.ingerman@dlapiper.com
keelan.diana@dlapiper.com

*Attorneys for Plaintiff*

### REQUEST FOR JURY TRIAL

Plaintiff Larry D. Washington hereby requests a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all triable issues.

/ s /

Brett Ingerman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

LARRY WASHINGTON #407-448,

        Plaintiff,

    v.

GARY D. MAYNARD, et al.,

        Defendants.

CIVIL ACTION NO. GLR-13-03767

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 27th day of February, 2015, a copy of the foregoing Amended Complaint was filed electronically and sent by electronic mail to Laura Mullally, Assistant Attorney General, Department of Public Safety and Correctional Services, at: lmullally@dpscs.state.md.us.

                                /s/
                              Brett Ingerman