IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LARRY WASHINGTON,                     :

    Plaintiff,                     :

v.                                    :     Civil Action No. GLR-13-3767

GARY D. MAYNARD, et al.               :

    Defendants.                    :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants'[1] Motion to Dismiss and/or Motion for Summary Judgment of the Second Amended Complaint (ECF No. 41) and Plaintiff Larry Washington's Motion to Allow Time for Discovery under Federal Rule of Civil Procedure 56(d) (ECF No. 46). Washington asserts various federal constitutional and state common law claims arising from an attack he suffered while he was a pretrial detainee in the BCDC. The Court, having reviewed the Motions and supporting documents, finds no hearing necessary. See Local Rule 105.6 (D.Md. 2014). For the reasons outlined below, the Court will deny Washington's Motion, deny the Prison Officials' Motion for

---

[1] Defendants include: Gary D. Maynard, former Secretary of the Maryland Department of Public Safety and Correctional Services; Marion Tuthill, former Warden of the Baltimore City Detention Center (the "BCDC"); Correctional Captain Karen Moore; Sergeant Michael Porter; and Correctional Officer ("CO") Andrene Ffowlkes (collectively, the "Prison Officials"). Washington's Second Amended Complaint also names Shavella Miles and Anika Beverly as defendants. To date, the Court has no record, however, that these defendants have been served.

Summary Judgment, and grant in part and deny in part the Prison Officials' Motion to Dismiss.

## I.   BACKGROUND[2]

### A.   The First Attack

Washington is a state prisoner currently incarcerated at the Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland.   From approximately May 2011 to September 2013, Washington was a pretrial detainee at BCDC.   In the spring of 2012, Washington was housed in F-section in cell 81-82.   Inmate Brandon Dovi, a known member of the Black Guerilla Family ("BGF") gang, was housed next to Washington in cell 79-80.   As a sanitation worker, Washington had access to locations throughout BCDC that were inaccessible to other inmates.   Attempting to exploit this access, Dovi asked Washington to transport contraband for the BGF.   Washington refused.   Shortly after Washington's refusal, Dovi and several other BGF members gained access to Washington's cell and attacked him.   Captain Moore identified Dovi as Washington's principal assailant.

Following the attack, BCDC personnel placed Dovi in punitive segregation.   Because neither Washington nor Captain Moore could identify Washington's other assailants, BCDC personnel relocated Washington to the Women's Detention Center

---

[2] The following facts are taken from the Second Amended Complaint and are assumed true for purposes of the Prison Officials' Motion to Dismiss.

("WDC") facility within BCDC.   After Washington received harassment and threats of retribution from members of the BGF while housed in the WDC, BCDC personnel relocated Washington twice more, ultimately assigning him to B-section.

## B.   __Washington Requests Relocation__

When Dovi was released from segregation, BCDC personnel assigned him to B-section—the same section where Washington was housed.   When Washington first saw Dovi in B-section, he immediately reported it to CO Ffowlkes, his tier officer, "explaining that he feared he would be attacked again, or worse, if he was not relocated." (Second Am. Compl. ["SAC"] ¶ 41, ECF No. 36).  CO Ffowlkes told Washington that she would contact her supervisor to report the issue, but "nothing happened."  (Id.). CO Ffowlkes then "claimed that she could in fact do nothing to relocate Mr. Washington."  (Id.).  Having obtained no action from CO Ffowlkes, Washington reported the issue to Captain Moore, who had identified Dovi as Washington's principal assailant in the earlier attack.  Captain Moore, however, claimed that she, too, "could do nothing for [Washington]." (Id. ¶ 42).

Several days later, Dovi began threatening Washington. Nevertheless, CO Ffowlkes again told Washington she could not relocate him to another housing unit.  As a result, Washington wrote multiple letters to Warden Tuthill, Captain Moore, and

3

Sergeant Porter, "imploring them to take minimum steps to protect his health and safety." (Id. ¶ 44). These Prison Officials, however, took no action.

## C.    **The Second Attack**

Dovi's threats worsened, and one day, after Washington again refused to transport contraband for the BGF, Dovi warned Washington that Dovi would "'stab [Washington] that night' unless he cooperated." (Id. ¶ 45). At this point, Washington continued to request aid from Warden Tuthill, Captain Moore, and Sergeant Porter. (Id.). On May 31, 2012, two days after Dovi threatened Washington's life, Dovi and several other BGF members gained access to Washington's cell and attacked him. One of the assailants stabbed Washington in the left eye with a sharp object. BCDC personnel eventually responded and summoned an emergency medical team. As a result of the Second Attack, Washington suffered broken bones and his left eye had to be surgically removed.

## D.    **Procedural History**

Washington, acting pro se, initiated this action on December 13, 2013 by filing a Complaint (ECF No. 1) and a Motion to Proceed in Forma Pauperis (ECF No. 2). The Court provisionally granted Washington's Motion to Proceed in Forma Pauperis on January 6, 2014. (ECF No. 3). Secretary Maynard, Warden Tuthill, and Captain Moore (collectively, the "Supervisor

Prison Officials") filed a Motion to Dismiss pursuant to Rule 12(b)(6) on March 6, 2014. (ECF No. 6). In response, Washington filed a brief opposition memorandum (ECF No. 9) and a Motion for Counsel (ECF No. 8). On April 3, 2014, the Court denied the Motion to Dismiss and granted Washington's Motion for Counsel. (ECF No. 10).

Following the appointment of counsel, Washington filed Amended and Second Amended Complaints. (ECF Nos. 14, 36). In his Second Amended Complaint, Washington asserts the following claims against the Prison Officials: violations of the Eighth and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983 (Counts I and II); negligence (Count IV); and intentional infliction of emotional distress (Count VI). Washington also brings the following claims against only the Supervisor Prison Officials: supervisory liability under 42 U.S.C. § 1983 (Count III); and negligent hiring, supervision, and retention (Count V).

On March 23, 2015, the Prison Officials filed a Motion to Dismiss and/or for Summary Judgment of the Second Amended Complaint (ECF No. 41). The Prison Officials move for summary judgment only as to the threshold issue of whether Washington's suit is barred for failure to exhaust administrative remedies. They also move to dismiss all six Counts in the Second Amended Complaint for failure to state a claim. Washington filed an

Opposition (ECF No. 45) on April 15, 2015, and the Prison Officials submitted their Reply (ECF No. 49) on May 18, 2015. Washington, on April 17, 2015, also filed a Motion to Allow Time for Discovery under Rule 56(d) (ECF No 46).  The Prison Officials submitted an Opposition (ECF No. 50) on May 18, 2015, and Washington filed his Reply (ECF No. 51) on June 1, 2015.

## II.  DISCUSSION

### A.  Washington's Motion to Allow Time for Discovery under Rule 56(d)

The Prison Officials move to dismiss under Rule 12(b)(6) and/or for summary judgment under Rule 56.  When deciding a Rule 12(b)(6) motion to dismiss, "the Court considers the complaint, as well as documents attached to it that are 'integral to the complaint.'"  Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 341 (D.Md. 2011) (quoting Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)).  Under Rule 12(d), "if 'matters outside the pleadings are presented to and not excluded by the court' in connection with a Rule 12(b)(6) motion, 'the motion must be treated as one for summary judgment under Rule 56.'"  Id.  Summary judgment, however, is ordinarily "inappropriate 'where the parties have not had an opportunity for reasonable discovery.'"  Id. (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011).

To oppose a summary judgment motion on the grounds that more time is needed for discovery, the non-movant must file an affidavit or declaration pursuant to Rule 56(d), "explaining why, 'for specified reasons, it cannot present facts essential to justify its opposition,' without needed discovery." Id. (quoting Fed.R.Civ.P. 56(d)). "Notably, 'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" Id. at 342 (quoting Young v. UPS, No. DKC-08-2586, 2011 WL 665321, at *20 (D.Md. Feb. 14, 2011)). "A party may not simply lament the lack of discovery; it must set forth its specific discovery needs in the Rule 56(d) affidavit." Archer v. Freedmont Mortg. Corp., No. GLR-12-1099, 2012 WL 5193828, at *4 (D.Md. Oct. 18, 2012) (citing Curtis v. Pracht, 202 F.Supp.2d 406, 412 (D.Md. 2002)).

"A non-moving party's Rule 56(d) request for additional discovery is properly denied 'where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment.'" Hamilton, 807 F.Supp.2d at 342 (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)). When the Court is satisfied that the Rule 56(d) motion should be granted, the Court may: "(1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or

declarations or to take discovery; or (3) issue any other appropriate order." Fed.R.Civ.P. 56(d).

In Washington's Rule 56(d) affidavit, which he attaches to his Motion, Washington emphasizes that the Prison Officials have moved for summary judgment <u>before</u> discovery has commenced. (Pl.'s Mem. in Supp. of Mot. to Allow Time for Disc. under Rule 56(d) Ex. 2, at 1, ECF No. 46-2). Washington also states that he cannot present facts essential to justify his opposition to the Prison Officials' Motion for Summary Judgment without discovery related to "all grievances, whether formal or informal, and other letters, forms, requests, and missives" he filed at the BCDC. (<u>Id.</u> at 4). Washington further states that he "wishes to take the depositions of Defendants." (<u>Id.</u> at 5).

The Prison Officials argue that the Court should not permit discovery because Washington could have presented an affidavit stating that he exhausted administrative remedies and Washington should already have possession of his grievance submissions. Washington asserts that administrative remedies were not available to him because "B.C.D.C. personnel" explicitly told Washington that he could not file a grievance for a personal injury. (Pl.'s Opp'n to Defs.' Mot. to Dismiss and/or for Summ. J. at 8-9, ECF No. 45). Obtaining copies of his grievances and deposing the Prison Officials, however, would not generate any facts as to whether BCDC personnel—not the Prison

8

Officials specifically—prevented Washington from availing himself of BCDC's grievance process.[3] Thus, the Court finds that the evidence Washington seeks through discovery would not by itself create a genuine issue of material fact sufficient to defeat summary judgment and will deny Washington's Motion.

**B.    The Prison Officials' Motion for Summary Judgment**

**1.    Standard of Review**

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Rule 56(c) requires

---

[3] Even assuming Washington intended to include the Prison Officials in his reference to "BCDC personnel," Washington does not state what specific information he would attempt to glean from the depositions of the Prison Officials. Parties must set forth their specific discovery needs in their Rule 56(d) affidavits. Archer, 2012 WL 5193828, at *4 (citing Curtis, 202 F.Supp.2d at 412).

the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. Id. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable

jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

    2.  **Analysis**

    The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) (2012), requires a prisoner confined in a jail, prison, or other correctional facility to exhaust available administrative remedies before filing a federal suit challenging the conditions of confinement.  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Haskins v. Hawk, No. ELH-11-2000, 2013 WL 1314194, at *8 (D.Md. Mar. 29, 2013) (quoting Jones v. Bock, 549 U.S. 199, 211 (2007)).  "Proper exhaustion" is required, "which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'"  Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).

    The PLRA explicitly provides that a prisoner must exhaust the administrative remedies that are "available" to him.  42 U.S.C. § 1997e(a).  Although the PLRA does not define the term "available," the United States Court of Appeals for the Fourth Circuit has "held that 'an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of the

administrative remedy.'" <u>Graham v. Gentry</u>, 413 F.App'x 660, 663 (4th Cir. 2011) (quoting <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008)).

The Prison Officials contend that Washington did not exhaust administrative remedies because he never submitted a grievance addressing the claims in his Second Amended Complaint. The Prison Officials also argue that Washington cannot plausibly contend that BCDC's administrative remedies were unavailable to him because he filed other grievances unrelated to the claims in his Second Amended Complaint. As explained above, Washington counters that administrative remedies were not available to him because BCDC personnel explicitly told him that he could not file a grievance challenging the conduct that led to the injuries he suffered in the Second Attack.

The Prison Officials present several "Grievance Forms" that Washington submitted when he was confined at BCDC. Only one of these Forms contains allegations arising from the Second Attack. (Defs.' Mot. to Dismiss and/or for Summ. J. Ex. 4, ECF No. 41-4). This Form, however, does not address any of the claims in the Second Amended Complaint; it focuses, instead, on BCDC's alleged failure to return Washington's personal property after the Second Attack. (<u>Id.</u>).

Washington presents no evidence that he submitted a grievance addressing the claims in his Second Amended Complaint. Instead, he presents an affidavit detailing statements that "Ms. Savage," a BCDC counselor and case worker, made when Washington was in the hospital recovering from the Second Attack. Washington states that when he asked Ms. Savage whether he should file a grievance before filing suit in court, Ms. Savage responded that "she did not think [Washington] could" and "that [Washington] should file a lawsuit." (Washington Aff. at 6, ECF No. 51-1).[4]  Washington then states that following Ms. Savage's advice, he filed the present suit without submitting a grievance.  (Id.).  The Court finds that Washington's sworn statements create a genuine dispute as to whether BCDC's grievance process was available to him.  Accordingly, the Court will deny the Prison Officials' Motion for Summary Judgment.[5]

---

[4] Pursuant to Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must . . . set out facts that would be admissible in evidence."  Hearsay is inadmissible except as otherwise provided by federal rule or statute. Fed.R.Evid. 802.  "A statement is not hearsay if it is offered to show that the statement was made, and not 'to prove the truth of the matter asserted' in the statement."  Mandengue v. ADT Sec. Sys., Inc., No. ELH-09-3103, 2012 WL 892621, at *20 (D.Md. Mar. 14, 2012) (quoting Fed.R.Evid. 801(c)).  Ms. Savage's statements would be admissible at trial because Washington does not offer them to prove the truth of the matter asserted—that BCDC's grievance process does not allow a particular grievance— but rather to prove that Ms. Savage made the statement and explain why Washington did not pursue a grievance.

[5] The Prison Officials also contend that even assuming Ms. Savage's statements create a genuine dispute as to whether

C.   **The Prison Officials' Motion to Dismiss**

1.   **Standard of Review**

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Edwards v. City of Goldsboro, 178 F.3d 231, 243–44 (4th Cir. 1999) (quoting Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the

---

administrative remedies were available to Washington, they only create this genuine dispute as to Washington's § 1983 claims. The Prison officials cite no authority, and the Court finds none, however, for the proposition that to be entitled to the lack-of-availability defense, Washington must have identified the six precise causes of action in his Second Amended Complaint when he asked Ms. Savage whether he should file a grievance. Such a requirement seems particularly unreasonable in this instance because Washington was recovering from a brutal attack and was not represented by counsel when he spoke with Ms. Savage.  Furthermore, construing the facts in the light must favorable to Washington, as the Court is required to do, Washington asked Ms. Savage whether he should file a grievance for the conduct leading to the injuries he sustained in the Second Attack and Ms. Savage responded that she did not think that was appropriate.  The Court finds that these facts are sufficient to create a genuine dispute as to whether BCDC's grievance process was available to Washington for all of his claims.

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 555 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd sub nom.</u>, <u>Goss v. Bank of Am., NA</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. <u>See Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 783 (4th Cir. 1999) (citing <u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, <u>Iqbal</u>, 556 U.S. at 678.

2.   **Analysis**

a.   **42 U.S.C. § 1983 Claims**

i. **Violations of the Eighth and Fourteenth Amendments (Counts I, II)**

To prevail on a 42 U.S.C. § 1983 claim, a plaintiff must demonstrate a deprivation of rights guaranteed by the Constitution or laws of the United States and that the alleged deprivation was committed by a "person" acting under color of state law. 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988) (citation omitted). Here, Washington alleges violations of the Eighth and Fourteenth Amendments.

Because Washington was a pretrial detainee at the time of the Second Attack, his § 1983 claims are governed by the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). Nevertheless, the Court will apply the Eighth Amendment standard when considering whether the Prison Officials violated Washington's Fourteenth Amendment right to due process. See Revels v. Shockley, No. 1:02-CV-03549-WMN, 2003 WL 23508097, at *1 (D.Md. Mar. 12, 2003) ("[The Fourth] Circuit has routinely applied the deliberate indifference standard to pretrial detainees, affirming that their due process rights are at least coextensive with the Eighth Amendment rights of convicted

prisoners." (citing <u>Grayson v. Peed</u>, 195 F.3d 692, 695 (4th Cir. 1999))), <u>aff'd</u>, 66 F.App'x 520 (4th Cir. 2003).

To establish an Eighth Amendment violation based on the failure to prevent harm to an inmate, an inmate must demonstrate two elements: (1) the inmate "is incarcerated under conditions posing a substantial risk of serious harm;" and (2) a prison official acted in "deliberate indifference" to the substantial risk of serious harm. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). A court assesses the first element using an objective standard and the second using a subjective standard. <u>See</u> <u>id.</u> at 834, 837. A prison official acts in deliberate indifference when he has actual knowledge that an inmate "face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id.</u> at 847. Constructive knowledge will not suffice—"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. In other words, inmates cannot establish deliberate indifference if the prison officials charged with Eighth Amendment violations prove "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed

(albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844.

The Prison Officials contend that Count I must be dismissed because Eighth Amendment claims raised by pretrial detainees are governed by the Fourteenth Amendment. To be sure, those claims are, indeed, governed by the Fourteenth Amendment. But the Prisoner Officials cite no authority, and the Court finds none, for the proposition that those claims should be summarily dismissed simply because they are governed by another Amendment. Moreover, as a matter of logic, it does not follow that Eighth Amendment claims raised by pretrial detainees must be dismissed out of hand simply because they are governed by another Amendment, especially when these claims are assessed under the Eighth Amendment standard. Thus, the Court will deny the Prison Officials' Motion to Dismiss Count I on these grounds.

The Prison Officials next assert that the Court should dismiss Count II as to Secretary Maynard because Washington does not allege that Secretary Maynard was deliberately indifferent toward Washington's predicament. The Court agrees. Washington does not allege that he ever informed Secretary Maynard, by letter or otherwise, that he feared Dovi would attack him. Consequently, Washington does not allege the actual knowledge required to state a claim against Secretary Maynard. The Court will, therefore, grant the Prison Officials' Motion to Dismiss

as to Count II against Secretary Maynard only.  Because Count I and Count II are analyzed under the same standard, the Court will also grant the Prison Officials' Motion to Dismiss as to Count I against Secretary Maynard only.

The Prison Officials further argue that the Court should dismiss Count II as to Warden Tuthill and Captain Moore because Washington does not allege that they drew the inference that Dovi's presence in B-section created a significant risk of serious harm to Washington.  The Prison Officials' argument belies the allegations in the Second Amended Complaint. Washington alleges that Warden Tuthill and Captain Moore had actual knowledge of the initial attack on Washington by the BGF, the BGF's hegemony within the BCDC, the danger the BGF posed to inmates who chose not to cooperate in their criminal enterprise within the BCDC, Dovi's presence in B-section notwithstanding Washington's repeated pleas to be relocated, and "the very real danger" Dovi's presence in B-section posed to Washington.  (SAC ¶¶ 5–7, 38, 42, 44–45, 50, 52–54, 63).  The allegation that Warden Tuthill and Captain Moore had actual knowledge of the danger that Washington faced implies they drew the inference that Dovi's presence in B-section created a substantial risk of serious harm to Washington.  What is more, Washington explicitly alleges that Warden Tuthill and Captain Moore "were aware of the facts from which the inference could be drawn that a substantial

risk of serious harm existed for Mr. Washington, and [they] drew this inference." (Id. ¶¶ 55, 64).   Thus, the Court finds Washington sufficiently alleges that Warden Tuthill and Captain Moore drew the inference of a substantial risk of serious harm and will deny the Motion to Dismiss Count II as to these Prison Officials.

### ii.  Supervisory Liability (Count III)

There is no respondeat superior liability under 42 U.S.C. § 1983.  Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004).  Thus, "for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'"  Garraghty v. Va., Dep't of Corr., 52 F.3d 1274, 1280 (4th Cir. 1995) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)).  It is well-settled, however, that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates."  Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)).  Supervisory liability "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on

those committed to their care.'" Id. (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)).

Plaintiffs "assume[] a heavy burden of proof in supervisory liability cases." Slakan, 737 F.2d at 373. To establish supervisory liability, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Baynard, 268 F.3d at 235 (quoting Shaw, 13 F.3d at 799). To satisfy the first element of this test, "the conduct engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread, or at least has been used on several different occasions.'" Randall v. Prince George's Cty., Md., 302 F.3d 188, 206 (4th Cir. 2002) (quoting Shaw, 13 F.3d at 799).

Washington alleges that at the time of the Second Attack, numerous BCDC employees were aiding and abetting the BGF's elaborate criminal enterprise within BCDC. (SAC ¶ 30). Washington specifies that BCDC employees smuggled and

transported contraband and concealed the BGF's activities within the BCDC from law enforcement.   (Id. ¶ 32).   Significantly, however, Washington does not allege that BCDC employees aided and abetted the BGF by failing to protect inmates from attacks by the BGF.   Although Washington alleges that "BGF habitually attacked inmates who refused to cooperate with their criminal schemes," he does not detail a single instance, other than his own, of BCDC employees failing to prevent a BGF attack on another inmate.   (Id. ¶ 44).   Accordingly, the Court finds Washington has not pled the pervasive conduct required to satisfy the first element of a claim for supervisory liability and will grant the Prison Officials' Motion to Dismiss as to Count III.

### b.    Negligence and Negligent Hiring, Supervision, and Retention (Counts IV, V)

#### i.    Public Official Immunity

The Prison Officials argue that the Supervisor Prison Officials are entitled to common law public official immunity. A governmental representative is entitled to public official immunity when: (1) the representative is acting as a public official; (2) the tortious conduct occurred while the representative was performing discretionary rather than ministerial acts; and (3) the representative acted without malice or gross negligence.  Cooper v. Rodriguez, 118 A.3d 829,

854 (Md. 2015); Livesay v. Balt. Cty., 862 A.2d 33, 39 (Md. 2004). "Prison guards are considered public officials" for purposes of public official immunity. Rodriguez v. State, 98 A.3d 376, 401 (Md.Ct.Spec.App. 2014) (citing Carder v. Steiner, 170 A.2d 220, 276 (Md. 1961), overruled on other grounds by James v. Prince George's Cty., 418 A.2d 1173 (Md. 1980)), aff'd sub nom., Cooper, 118 A.3d 829. More generally, an individual qualifies as a public official when he "acts as an arm of the State." Livesay, 862 A.2d at 40 (quoting Carder, 170 A.2d at 222). Assigning housing units to inmates and considering relocation requests are discretionary functions of prison administrators. See Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991).

In this context, "[m]alice is established by proof that [the defendant] intentionally performed 'an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure [the plaintiff].'" Kebe v. Brown, 161 F.Supp.2d 634, 644–45 (D.Md. 2001) (quoting Williams v. Mayor of Balt., 753 A.2d 41, 57 n.16 (Md. 2000)). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." Cooper, 118 A.3d at 845 (quoting Barbre v. Pope, 935 A.2d 699, 717 (Md. 2007)). It "implies a thoughtless

disregard of the consequences without the exertion of any effort to avoid them." Id. at 845-46 (quoting Barbre, 935 A.2d at 717). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." Id. at 846 (quoting Taylor v. Harford Cty. Dep't of Soc. Servs., 862 A.2d 1026, 1034 (Md. 2004)).

While Secretary Maynard and Warden Tuthill were not prison guards like Captain Moore, they were arms of the state that served the Maryland Department of Public Safety and Correctional Services. The genesis of Washington's claims—his relocation requests—fell within the discretion of the Supervisor Prison Officials. Washington's Second Amended Complaint is devoid of any allegations from which the Court could infer that the Supervisor Prison Officials acted with malice. Washington alleges that the Prison Officials exhibited "callous indifference to [Washington's] health and safety," but callous indifference is far from "an evil or rancorous motive influenced by hate." Kebe v. Brown, 161 F.Supp.2d at 645 (quoting Williams, 753 A.2d at 57 n.16; (SAC §§ 78, 85).

Washington does, however, allege facts sufficient to constitute gross negligence by Warden Tuthill and Captain Moore. Washington avers that Warden Tuthill and Captain Moore intentionally and recklessly ignored Washington's repeated

requests to be relocated to another housing unit notwithstanding their knowledge that Dovi had previously attacked Washington. (SAC ¶¶ 42, 44-45, 50, 52-54, 61, 63, 78, 85, 87). Washington further alleges that Warden Tuthill and Captain Moore disregarded the excessive risk to Washington's health and safety that Dovi posed when they ignored Washington's relocation requests. (Id.). Thus, at this stage of the litigation, Warden Tuthill and Captain Moore are not entitled to public official immunity for Counts IV and V.

The same cannot be said of Secretary Maynard. Because Washington does not allege that he informed Secretary Maynard of the imminent risk he faced and the continued inaction of the other Prison Officials notwithstanding their actual knowledge of that risk, the Court finds that Washington fails to aver that Secretary Maynard intentionally failed to protect him. Thus, the Court finds that Secretary Maynard is entitled to public official immunity for Counts IV and V.

### ii. Governmental Immunity

The Prison Officials further argue that they are entitled to governmental immunity because Washington brings causes of action for negligence—not gross negligence. Washington counters that although he does not bring causes of action for gross negligence, he nevertheless alleges that the Prison Officials acted in a grossly negligent manner.

Under the Maryland Tort Claims Act ("MTCA"), "[s]tate personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article ["CJP"]."  Md.Code Ann., State Gov't § 12-105 (West 2015).  CJP § 5-522(b), in turn, provides that state personnel "are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity."

To be sure, Washington does not bring a cause of action for gross negligence.  But, as previously discussed, he alleges facts constituting gross negligence.  The Court finds, therefore, that Washington alleges sufficient facts to defeat, at the pleadings stage, governmental immunity under the MTCA.

Accordingly, at this juncture of the litigation, only Secretary Maynard is immune from liability for the conduct alleged in Counts IV and V.  Because Washington only brings claims for negligence, not gross negligence, however, the Court will grant the Prison Officials' Motion to Dismiss as to Counts IV and V against all the Prison Officials, but will direct Washington to amend these Counts only as to Warden Tuthill, Captain Moore, Sergeant Porter, and CO Ffowlkes.

###        c.    Intentional Infliction of Emotional Distress
              ("IIED") (Count VI)

The Prison Officials contend that Washington fails to allege a single element of a claim for IIED. To state a claim for IIED, Washington must allege four elements: (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress. Harris v. Jones, 380 A.2d 611, 614 (Md. 1977); Arbabi v. Fred Meyers, Inc., 205 F.Supp.2d 462, 465-66 (D.Md. 2002). In Maryland, IIED claims are "rarely viable" and, thus, subject to a heightened pleading standard. Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297, 319 (Md.Ct.Spec.App. 1995). Each of the four elements of an IIED claim must "be pled . . . with specificity." Foor v. Juvenile Servs. Admin., 552 A.2d 947, 959 (Md.Ct.Spec.App. 1989). When assessing whether a plaintiff has pled an IIED claim, "the four elements of the tort must coalesce, i.e., unite, combine or blend into a single body." Reagan v. Rider, 521 A.2d 1246, 1251 (Md.Ct.Spec.App. 1987). The Court should not consider each of the four elements "separately and independently from the others." Id.

A plaintiff satisfies the first element of an IIED claim when he demonstrates a defendant "desired to inflict severe emotional distress, knew that such distress was certain or

27

substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow." <u>Brengle v. Greenbelt Homes, Inc.</u>, 804 F.Supp.2d 447, 452 (D.Md. 2011) (quoting <u>Interphase Garment Sols., LLC v. Fox Television Stations, Inc.</u>, 566 F.Supp.2d 460, 466 (D.Md. 2008)).

As for the second element, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Harris</u>, 380 A.2d at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (Am.Law Inst. 1965)). "The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." <u>Hamilton v. Ford Motor Credit Co.</u>, 502 A.2d 1057, 1064 (Md.Ct.Spec.App. 1986). In assessing whether a plaintiff has alleged extreme and outrageous conduct, "courts should consider multiple factors, including the context in which the conduct occurred, the personality of the plaintiff and [his] susceptibility to emotional distress, and the relationship between the defendant and plaintiff." <u>Brengle</u>, 804 F.Supp.2d at 453. "[T]he extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or

apparent authority over him, or power to affect his interests." Harris, 380 A.2d at 616.

The fourth element of an IIED claim imposes a "high burden." See Manikhi v. Mass Transit Admin., 758 A.2d 95, 114–15 (Md. 2000) (collecting cases). "[F]or distress to be sufficiently severe to state a claim for [IIED], the plaintiff must show that he suffered a severely disabling emotional response to the defendant's conduct,' and that the distress was so severe that no reasonable man could be expected to endure it." Solis v. Prince George's Cty., 153 F.Supp.2d 793, 804 (D.Md. 2001) (quoting Thacker v. City of Hyattsville, 762 A.2d 172, 197 (Md.Ct.Spec.App. 2000)). To be severe, emotional distress need not produce total emotional disablement, but it must render the plaintiff unable to function and tend to necessary matters. Reagan, 521 A.2d at 1250. "[S]everity must be measured in light of the outrageousness of the conduct and the other elements of the tort." B.N. v. K.K., 538 A.2d 1175, 1182 (Md. 1988) (citing Reagan, 521 A.2d at 1251). "In appropriate cases, 'severe' emotional distress may be inferred from the extreme and outrageous nature of the defendant's conduct alone." Reagan, 521 A.2d at 1251 (citation omitted).

Washington does not aver that he or any of the Prison Officials relayed the details of Washington's plight to Secretary Maynard. While Washington alleges he wrote numerous

letters expressing his fear and dire need for relocation, he never alleges that he sent any of these letters to Secretary Maynard. Consequently, Washington's allegation that all the Prison Officials acted with "extreme recklessness" is wholly conclusory as to Secretary Maynard because Washington does not allege any facts from which the Court could infer Secretary Maynard deliberately disregarded a high probability that Washington would suffer emotional distress. (SAC ¶ 87). Accordingly, the Court finds Washington fails to state an IIED claim against Secretary Maynard and will grant the Prison Officials' Motion to Dismiss as to Count VI against Secretary Maynard only.

As for the remaining Prison Officials, Washington's allegation of "extreme recklessness" is far from conclusory. (Id. ¶ 87). Washington alleges that he informed the other Prison Officials on multiple occasions that he feared for his safety because Dovi previously attacked him and BCDC placed Dovi in B-section following Dovi's release from punitive segregation. (SAC ¶ 41–45, 50, 52–54, 61, 63). Washington also states that the other Prison Officials were aware that the BGF would routinely attack other inmates who refused to cooperate in the BGF's criminal enterprise within BCDC. (Id. ¶ 44). Thus, the Court finds that Washington sufficiently alleges that the other Prison Officials deliberately disregarded the high probability

that Washington would endure emotional distress if he were not relocated.

Washington alleges various grave transgressions by corrections officers and their supervisors—the very personnel tasked with maintaining order, peace, and safety in the BCDC. Because they exercise dominion over virtually every aspect of an inmate's daily life in prison, corrections officers and their supervisors have the utmost power to affect the interests of inmates. Washington alleges that the Prison Officials abused this power when they repeatedly ignored his requests to be relocated notwithstanding their knowledge that Dovi was likely to attack Washington again and even explicitly threatened to do so. Furthermore, the Second Attack left Washington seriously disfigured and he was forced to interact with BCDC staff and the other inmates with an empty eye socket until he received a prosthetic eye. Contributing to such a grave physical disfigurement strikes to the very core of one's being. Based on these allegations, the Court finds that Washington has sufficiently alleged extreme and outrageous conduct.

The Prison Officials' contention that Washington does not allege a causal connection between the extreme and outrageous conduct utterly contradicts the allegations of the Second Amended Complaint. Washington avers that "[a]s a direct and proximate result of [the Prison Officials'] reckless, extreme,

and outrageous conduct, Mr. Washington endured a horrific attack . . . in which he lost his eye and suffered other emotional, psychological, and physical injuries." (SAC ¶ 89). The Second Amended Complaint is also replete with other allegations from which the Court can reasonably infer the causal connection. (See id. ¶¶ 57, 59, 67, 72, 77, 83).

The Prison Officials argue Washington fails to allege the fourth element of an IIED claim because he does not allege that he is unable to tend to everyday affairs. Washington states that as a result of the Second Attack, he must take medication to manage the "severe anxiety" and "crippling panic attacks" he "regularly endures" and attend meetings with a trauma support group. (SAC ¶¶ 7, 48, 57, 65). He also alleges that he remains under medical supervision at RCI. (Id. ¶¶ 57, 65). While these repercussions from the Second Attack might be insufficient on their own to constitute severe emotional distress, they cross that threshold when considered in light of the outrageous conduct that Washington pleads. Considering their positons of authority and control over Washington's safety and wellbeing, the Prison Officials' conduct in deliberately facilitating the Second Attack is particularly outrageous. When this outrageous conduct is coupled with the emotional distress that Washington specifically details, the Court finds Washington pleads severe emotional distress.

Accordingly, because Washington sufficiently alleges all four elements on an IIED claim, the Court will deny the Prison Officials' Motion to Dismiss as to Count VI against all the Prison Officials except Secretary Maynard.

### CONCLUSION

Based on the foregoing reasons, Washington's Motion to Allow Time for Discovery under Rule 56(d) (ECF No. 46) will be DENIED, the Prison Officials' Motion for Summary Judgment (ECF No. 41) will be DENIED, and the Prison Officials' Motion to Dismiss (ECF No. 41) will be GRANTED in part and DENIED in part. Counts III, IV, and V of the Second Amended Complaint will be DISMISSED.   Counts I, II, and VI will be DISMISSED as to Secretary Maynard only.   The Court will direct Washington to amend Counts IV and V only as to Warden Tuthill, Captain Moore, Sergeant Porter, and CO Ffowlkes within fourteen days.   The Second Amended Complaint will be DISMISSED as to Secretary Maynard.   A separate Order follows.

Entered this 7th day of March, 2016

Very truly yours,

/s/

_____
George L. Russell, III
United States District Judge